**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| CANALS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>APPLICO, LLC, APPLICO CAPITAL LLC, APPLICO CAPITAL B2B I, LP, ALEXANDER MOAZED, NICHOLAS JOHNSON, and JOHN SCHUMACHER,<br><br>Defendants. | Case No.: 1:26-cv-25859<br><br>**COMPLAINT** |

Plaintiff Canals, Inc. ("Canals"), by and through its undersigned counsel, brings this action against Defendants Applico, LLC and Applico Capital LLC (individually and collectively, "Applico Capital"), Applico Capital B2B I, LP (the "Applico Fund," and together with Applico Capital, "Applico"), Alexander Moazed ("Moazed"), Nicholas Johnson ("Johnson"), and John Schumacher ("Schumacher," and together with Moazed and Johnson, the "Applico Principals," and together with Applico Capital and the Applico Fund, "Defendants") and alleges as follows:

## INTRODUCTION

1. This action arises from a calculated scheme by Defendants to misappropriate Canals' trade secrets and confidential business information, exploit that proprietary knowledge to build a competing product, and divert Canals' customers. Canals brings claims for trade secret misappropriation and breach of the covenant of good faith and fair dealing to hold Defendants accountable for their misconduct.

2. In the summer of 2025, the Applico Fund, an investment fund managed by Applico Capital and run by the Applico Principals, invested in Canals, a technology company

that develops software powered by artificial intelligence ("AI") for the wholesale distribution industry.

3. The Applico Fund's investment in Canals was not passive. Pursuant to the parties' agreements, the Applico Fund's entitlement to a significant portion of its equity in Canals was conditioned on providing "Business Development Support" to Canals, including "bona fide" introductions to specific prospective customers and contacts.

4. To facilitate this relationship, Applico Capital and the Applico Fund each agreed to confidentiality terms, and Canals shared with Defendants its most sensitive business information, including confidential information about its product capabilities, sales methodology, customer data, pricing, financial information, and business strategies.

5. Unbeknownst to Canals, Defendants used the investment as a cover to gain access to Canals' trade secrets and confidential information, which the Applico Principals used to build a competing AI product, called "Merlin," that targets the very same wholesale distribution market and customers that Canals serves. The Applico Principals also exploited their role in providing purported "Business Development Support" to Canals to gather competitive intelligence and cultivate their own relationships with Canals' existing and prospective customers.

6. In April 2026, the Applico Principals publicly announced the launch of Merlin and its sale to Augment Technologies, Inc. ("Augment"). The Applico Principals also announced that they were joining Augment to run its new wholesale distribution business group.

7. Since then, the Applico Principals have continued using Canals' trade secrets and confidential information to develop Augment's competing products and solicit Canals' existing and prospective customers.

8. This time last year, Moazed was running an investment firm centered on helping startups serve distributors. Now, he, Johnson, and Schumacher are working for a company that is actively competing with the startups they were serving (even while the company proclaims that it is "Built on Trust").

9. The harm caused by Defendants' misconduct is immediate and continuing, and Canals brings this action to recover the damages it has suffered and continues to suffer and to enjoin Defendants from using or disclosing Canals' proprietary information further.

## THE PARTIES

10. Canals, Inc. is incorporated under the laws of Delaware and has a principal place of business in Coral Gables, Florida.

11. Applico, LLC is a limited liability company organized under the laws of Florida with a principal place of business in Boca Raton, Florida, where its senior officers direct, control, and coordinate its operations. Applico Capital LLC is a limited liability company organized under the laws of Delaware and, on information and belief, has a principal place of business in Boca Raton, Florida, where its senior officers direct, control, and coordinate its operations. On information and belief, Applico, LLC and Applico Capital LLC conduct business under the name "Applico Capital," share a common principal place of business, common ownership, and common management. For the reasons set forth below, Canals is unable to determine which of these two entities executed the Mutual Non-Disclosure Agreement ("MNDA") on May 16, 2025, and therefore sues both Applico, LLC and Applico Capital LLC in the alternative. Canals entered into the MNDA on May 16, 2025, with an entity identified in the MNDA as "Applico Capital LLC, a Florida limited liability company with a place of business at 5550 Glades Road Suite 500 #1028 Boca Raton FL, 33431." However, no entity named "Applico Capital LLC" is registered with the Florida Department of State, Division of Corporations. Therefore, on information and

belief, the counterparty to the MNDA was either Applico, LLC, organized under the laws of Florida, or Applico Capital LLC, organized under the laws of Delaware. Canals sues both entities here in the alternative and refers to the counterparty that executed the MNDA throughout this Complaint as "Applico Capital."

12. Applico Capital B2B I, LP is a limited partnership organized under the laws of Delaware with a principal place of business in Boca Raton, Florida, where its business and affairs are directed, controlled, and coordinated. On information and belief, Applico Capital B2B I, LP is an affiliated investment fund managed by Applico Capital.

13. Alexander Moazed is a founding partner and CEO of Applico Capital and a founding partner of Applico B2B GP I, LLC, the general partner of the Applico Fund. On information and belief, Moazed is a resident of and domiciled in West Palm Beach, Florida.

14. Nicholas Johnson is a founding partner of Applico Capital who, on information and belief, is a resident of and domiciled in New York.

15. John Schumacher was an operating partner of Applico Capital who, on information and belief, is a resident of and domiciled in New York.

## JURISDICTION AND VENUE

16. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the Defend Trade Secrets Act, 18 U.S.C. § 1836 ("DTSA"). This Court may exercise supplemental jurisdiction over all other claims pursuant to 28 U.S.C. § 1367 because they arise out of a common nucleus of operative facts as the DTSA claim.

17. This Court may exercise personal jurisdiction pursuant to Fla. Stat. § 48.193(2) over Applico, LLC, Applico Capital LLC, the Applico Fund, and Moazed because they are at home in Florida.

18. This Court may exercise personal jurisdiction over each Defendant pursuant to Fla. Stat. § 48.193(1) because each committed tortious acts in Florida, including the misappropriation of Canals' trade secrets, and Canals suffered and continues to suffer the injury caused by Defendants' conduct in Florida.

19. Each of the Defendants has sufficient minimum contacts with the state of Florida to satisfy the Due Process requirements of the Fourteenth Amendment to the United States Constitution.

20. Venue is proper in the United States District Court for the Southern District of Florida pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Canals' claims occurred in this District.

## FACTS

### I. Canals and Its Business

21. Canals is a technology company that develops and provides software powered by artificial intelligence for manufacturers, distributors, and contractors in the wholesale business-to-business ("B2B") distribution industry. Canals' products facilitate, among other things, sales, customer service, accounting, purchasing, and receiving operations.

22. Over the past several years, Canals has invested substantial time, effort, and resources into developing its proprietary technology, business strategies, customer relationships, and confidential business information, which give Canals a competitive advantage in the industry.

23. Canals carefully protects the secrecy of its trade secrets and proprietary information and discloses such information to others only under strict confidentiality conditions.

24. As a general practice, Canals requires anyone who accesses its sensitive information to agree to confidentiality obligations, and it grants access on a need-to-know basis.

This applies equally to Canals' own personnel (including prospective employees) and to external parties, such as investors and business partners.

25. When sharing sensitive information with external parties, Canals does so through electronic secure data rooms, which are inaccessible without Canals' prior approval. Canals closely monitors access to its data rooms, including by tracking who has viewed which documents and when.

26. Additionally, if anyone downloads a document from a data room, the downloaded version of the document automatically displays a "Confidential" watermark across the document, along with the email address associated with the download.

27. Canals' trade secrets and confidential information derive independent economic value from being kept secret, and they are not generally known to or readily ascertainable by Canals' competitors. A competitor with access to this information could replicate Canals' approach to the market, target Canals' customers, and undercut Canals' competitive position without incurring the time and expense Canals invested.

**II. Applico Gains Access to Canals' Trade Secrets**

28. In or around February 2025, the parties began exploring a potential investment by Applico in Canals, primarily through communications between Moazed and Canals' CEO, Michael Delgado ("Delgado"), who resides in Florida.

29. To facilitate open discussions between Applico and Canals with respect to the prospective investment, Applico Capital and Canals entered into a Mutual Non-Disclosure Agreement dated May 16, 2025.

30. The MNDA defined "Confidential Information" broadly as information that is "confidential, non-public, competitively sensitive and/or proprietary," and as encompassing,

among other things, Canals' business plans, customer information, financial data, technologies, know-how, algorithms, trade secrets, and research and development.

31. The MNDA required Applico Capital, for a period of three years, to keep that information confidential, not to use it in a manner inconsistent with the agreement, and not to use it "to compete with or adversely affect the business or operations of" Canals.

32. Applico Capital was authorized to disclose Confidential Information received from Canals to its personnel and affiliates on a need-to-know basis and "so long as such Representatives agree to be bound by" the MNDA.

33. The MNDA is one of several instruments reflecting that Canals treated its business information as confidential and imposed obligations of secrecy and non-use on those it allowed into its confidence.

34. After executing the MNDA, Canals shared its trade secrets and confidential information with Defendants through multiple channels, including a secure electronic data room and direct communications between Canals' personnel and the Applico Principals.

35. Canals' data room included the following:

a. Canals' internal organizational records and business overviews, strategies, outlooks, and operating models, including financial information such as business capitalization tables, analyses and projections, and bank statements;

b. Canals' product overviews and demonstrations, including information about product capabilities and potential updates; and

c. Information about Canals' existing and prospective customers, including compilations of pricing, order history, revenues generated or projected by each customer, and contracts.

36. The data room Canals shared with Defendants was subject to the access, monitoring, and watermarking controls described above.

37. Moazed accessed Canals' secure data room on May 27, 2025, gaining access to Canals' trade secrets and confidential information contained therein.

38. Patrick Kanaley, then an associate of Applico Capital and now an employee in Augment's wholesale distribution group, also accessed the data room on May 27 and 28, 2025.

39. In addition to the information shared through the data room, Canals also shared its trade secrets and confidential information with Applico and the Applico Principals through confidential emails, calls, and meetings. In those communications, the Applico Principals solicited confidential information from Canals' personnel, including Delgado, about Canals' product roadmaps and planned features, pricing methodology and specific customer pricing, how Canals wins and services enterprise distribution accounts, the identities and status of specific customer prospects, and business growth projections.

40. Canals shared its trade secrets and confidential information with the Applico Principals solely because they were acting on behalf of Applico in connection with the prospective, and later actual, investment in Canals, and under circumstances imposing a duty to maintain the confidentiality of that information.

## III. The Applico Fund's Investment in Canals

41. On or around July 11, 2025, the Applico Fund invested $2,000,000 in Canals through a Convertible Promissory Note (the "Note"), issued pursuant to a Note Purchase Agreement.

42. Under the Note, half of the Applico Fund's conversion rights vested automatically upon execution, and the remaining half vested only as the Applico Fund accumulated credit for providing "Business Development Support" to Canals.

43. On December 1, 2025, Canals closed its Series A Preferred Stock financing (the "Series A Closing").

44. In connection with the Series A Closing, the Note converted into 130,466 shares of Canals' Series A-1 preferred stock.

45. In connection with the Series A Closing, the Applico Fund entered into a series of agreements with Canals. The confidentiality obligations imposed on Defendants reflected, for example in the MNDA, were reinforced by such agreements. For example, the Applico Fund entered into the Series A Investors' Rights Agreement dated December 1, 2025 (the "IRA"), under which each investor, including the Applico Fund, agreed to "keep confidential and . . . not disclose, divulge, or use for any purpose (other than to monitor or make decisions with respect to its investment in [Canals]) any confidential information obtained from" Canals.

46. The Applico Fund also entered into a Stock Restriction Agreement dated December 1, 2025 (the "SRA"), a true and correct copy of which is attached as **Exhibit A**. Under the SRA, 26,092 of the Applico Fund's Series A-1 preferred shares (the "Unvested Shares") remained unvested as of the Series A Closing and could vest only as the Applico Fund earned credit for providing "Business Development Support" to Canals.

47. The SRA carried forward the same business development vesting framework that had governed the Note.

48. Appendix A to the SRA defined "Business Development Support" as making an "Introduction" or a "Facilitation." An "Introduction" is a "bona fide, individualized, positive

introduction by [the Applico Fund] directly connecting a Qualified Person of a Wholesale Distribution Business to a designated representative of [Canals].” A “Facilitation” is an “individualized positive written endorsement, reference, follow-up or other nudge by [the Applico Fund] to a Qualified Person that materially advance[d] a pending commercial discussion between [Canals] and a Wholesale Distribution Business.” A “Qualified Person” is defined to include specific executive employees and owners of target companies, as listed in Appendix B to the SRA. “Wholesale Distribution Business” is defined as a business listed in Appendix B to the SRA.

49. The SRA thus permitted the Unvested Shares to vest only through (a) individualized business development introductions that were “bona fide” (i.e., genuine and made in good faith) or (b) endorsements that materially advanced Canals’ commercial discussions with the specified wholesale distribution businesses.

50. The Applico Fund purported to provide such Business Development Support and induced Canals to treat its efforts as bona fide and undertaken in good faith.

**IV. While Purporting to Support Canals, The Applico Principals Were Exploiting Canals’ Trade Secrets and Confidential Information to Build a Competing Product**

51. Unbeknownst to Canals, while the Applico Principals, through Applico, were inducing Canals to share its sensitive trade secrets and confidential data and were purporting to provide Canals with Business Development Support, they were simultaneously developing their own competing product for the same B2B wholesale distribution market that Canals serves.

52. On information and belief, the Applico Principals orchestrated the prospective investment in Canals as a vehicle to gain access to Canals’ trade secrets and confidential business information for the purpose of using that information to build a competing business.

53. On information and belief, the Applico Principals induced Canals to share its information as described above, and did in fact use that information to help build their competing product.

54. For example, Schumacher requested additional access to specific trade secrets and confidential information from Canals in August and September of 2025. During that timeframe, Schumacher initiated conversations with Delgado and requested additional documents and information regarding Canals' product capabilities, business strategies, and product roadmap under the guise of seeking to deepen his understanding of the business to better support Canals. In a September 2025 conversation with Delgado, Schumacher specifically questioned Canals in detail about its product integration capabilities and future projections.

55. Relying on Schumacher's representations that he was seeking to support Canals and understanding that Schumacher was acting in furtherance of the confidential investment relationship, Canals gave Schumacher access to the additional documents and information he requested.

56. On information and belief, Schumacher's representations were false, and he instead sought Canals' trade secrets and confidential information for the ulterior purpose of using them to develop the competing product, Merlin.

57. Similarly, Moazed and Johnson purported to make Introductions and develop relationships for Canals under the guise of the Business Development Support provisions of the Note and the SRA, when, on information and belief, they were gathering competitive intelligence about Canals' customers and prospective customers, while also building their own relationships with executives in the industry to position themselves, and Merlin, to compete with Canals.

58. The Applico Principals were secretly collaborating with multiple wholesale distribution companies, who are now customers of Augment, regarding the development of their competing product, even as they represented to Canals that they would help Canals win business from some of those same companies. On information and belief, the Applico Principals used their access to Canals' trade secrets and confidential information, and the relationships cultivated through their purported Business Development Support for Canals, to pursue those companies and convert them into customers of their own competing venture.

## V. The Applico Principals Launched Their Competing Venture and Continue to Use Canals' Trade Secrets and Confidential Information to Compete Against Canals

59. On April 29, 2026, Moazed publicly announced on LinkedIn that he, Johnson, and Schumacher were joining Augment to lead its new B2B wholesale distribution business group and that Merlin had been acquired by Augment. A true and correct screenshot of Moazed's LinkedIn post is attached hereto as **Exhibit B**.

60. Moazed's LinkedIn post confirms that the Applico Principals had been building Merlin "in stealth" "[f]or the past few quarters"—i.e., during the same time period that they were accessing Canals' trade secrets and confidential information, purporting to provide Business Development Support, and cultivating relationships with Canals' existing and prospective customers.

61. Augment's new B2B wholesale distribution group, led by the Applico Principals—with Moazed serving as President of Wholesale Distribution, Johnson as Head of Commercial, and Schumacher as Development and Product Leader and/or Director of Engineering—markets products that directly overlap with those marketed by Canals and is actively attempting to sell those products to the same market participants that Canals solicits and serves.

62. Certain Merlin features directly mimic elements of Canals' product offerings, including, for example, Canals' Sales Order Entry tool ("SOE"). Like SOE, Merlin's sales order processing module (a) parses unstructured customer order requests received through email and other media into structured sales order data and (b) uses matching technology to match the products identified in those order requests to the corresponding SKUs in the wholesale distributor's product catalog. Merlin also uses AI to adapt its sales order processing module to each individual customer's unique workflow and preferences. These capabilities are central features of SOE and a core component of Canals' value proposition in the wholesale distribution market. On information and belief, Merlin's development and implementation of these capabilities were derived from, or materially enhanced by, confidential conversations in which Canals shared proprietary information, including trade secrets, concerning the design, operation, implementation, and commercial positioning of SOE. The Applico Principals' subsequent marketing of Merlin likewise reflects Canals' trade secrets, including valuable commercial insights that Canals shared regarding the features and capabilities that drive customer adoption of SOE and underpin its strong product-market fit.

63. On information and belief, before acquiring Merlin, Augment did not have any distribution-specific product capabilities that overlapped with those offered by Canals. Yet with the Applico Principals' involvement, Augment entered the B2B distribution market with a product built to replicate the confidential product capabilities and roadmap that Canals had shared with the Applico Principals.

64. On information and belief, the Applico Principals have taken Canals' trade secrets and confidential information to Augment and are using that information to build a competing business at Augment, including by:

a. Using information compiled by Canals about its existing and prospective customers to solicit those customers for Augment;

b. Using Canals' business strategies, pricing information, and competitive information to market Augment's competing products and services against Canals';

c. Using Canals' product information and demonstrations to develop competing products and services at Augment; and

d. Using the relationships cultivated during the Applico Fund's sham Business Development Support to pursue Canals' customers and prospective customers and convert them into customers of Augment.

## CAUSES OF ACTION

### COUNT I: MISAPPROPRIATION OF TRADE SECRETS UNDER 18 U.S.C. § 1836 (Against All Defendants)

65. Canals repeats and realleges the allegations in Paragraphs 1-64 as if fully set forth herein.

66. Canals owns confidential trade secret information within the meaning of 18 U.S.C. § 1839(3). This trade secret information includes, but is not limited to: (a) Canals' proprietary technology, product capabilities, features, and planned updates, including detailed product demonstrations and overviews; (b) Canals' sales methodology, go-to-market strategy, and pricing models for the B2B wholesale distribution market; (c) Canals' customer lists, including the identity of existing and prospective customers, customer preference data, order history, revenues generated by each customer, and the status of pending commercial discussions; (d) Canals' financial information, including business projections, capitalization data, and operating models; (e) Canals' competitive analyses and market assessments; and (f) information

conveyed in conversations between Canals' personnel and the Applico Principals regarding Canals' product roadmaps, business strategies, and customer relationships.

67. Canals has taken reasonable measures to keep such information secret, including by storing such information in secure data rooms, using nondisclosure agreements such as the MNDA and applicable provisions of the IRA, and communicating such information under the explicit expectation that such information be kept confidential.

68. Canals' trade secret information is invaluable to Canals' core functions and operations, and Canals' trade secret information derives independent economic value from not being generally known to, or readily ascertainable through proper means by, another person or entity that could obtain economic value from its disclosure or use. Canals' trade secrets are the by-product of countless hours and significant expense on Canals' part, and the trade secrets afford Canals an advantage over its competitors.

69. The information accessed by Defendants was only made available to Defendants due to the investment and business-development relationship between them and under the condition that Defendants would preserve the secrecy of Canals' information, as described above.

70. Canals would not have granted Defendants access to its trade secrets had Canals known they were using Canals' information to develop a competing product.

71. Canals' trade secret information relates to products and services used or intended to be used in interstate commerce.

72. Defendants each misappropriated Canals' trade secrets as alleged above, including by acquiring them under improper means. On information and belief, Defendants also misappropriated Canals' trade secrets as alleged above, by using and disclosing Canals' trade

secrets to develop and market a competing product and to solicit Canals' existing and prospective customers.

73. On information and belief, each of the Applico Principals disclosed Canals' trade secrets to Augment in connection with the sale of Merlin and their joining Augment, and they continue to use Canals' trade secrets at Augment to develop competing products and to solicit Canals' existing and prospective customers, including by using Canals' customer data, pricing information, sales methodology, and product information to market Augment's competing products against Canals.

74. Defendants were and remain under the obligation not to improperly take, use, or disclose Canals' trade secrets.

75. Canals did not consent to how Defendants accessed, used, or disclosed its trade secrets, as alleged above.

76. Defendants' conduct violates the Defend Trade Secrets Act.

77. As the direct and proximate cause of Defendants' conduct, Canals has suffered and, if Defendants' conduct is not stopped, will continue to suffer competitive harm, irreparable injury, and significant monetary damages, in an amount to be proven at trial.

78. If Defendants are not enjoined, they will continue to use Canals' trade secrets for their own unlawful benefit and to Canals' detriment.

79. Because Canals' remedy at law is inadequate, Canals seeks, in addition to monetary damages, injunctive relief to account for, recover, and protect its confidential trade secret information from further misuse and to protect its related legitimate business interests.

80. Defendants' misappropriation of Canals' trade secrets and confidential information was intentional, knowing, willful, malicious, fraudulent, and oppressive. Canals is therefore entitled to an award of exemplary damages and attorneys' fees.

**COUNT II: MISAPPROPRIATION OF TRADE SECRETS UNDER FLA. STAT. § 688.001 *et seq.***
**(Against All Defendants)**

81. Canals repeats and realleges the allegations in Paragraphs 1-64 as if fully set forth herein.

82. Canals owns specific confidential trade secret information within the meaning of Fla. Stat. § 688.002(4). This trade secret information includes, but is not limited to: (a) Canals' proprietary technology, product capabilities, features, and planned updates, including detailed product demonstrations and overviews; (b) Canals' sales methodology, go-to-market strategy, and pricing models for the B2B wholesale distribution market; (c) Canals' customer lists, including the identity of existing and prospective customers, customer preference data, order history, revenues generated by each customer, and the status of pending commercial discussions; (d) Canals' financial information, including business projections, capitalization data, and operating models; (e) Canals' competitive analyses and market assessments; and (f) information conveyed in conversations between Canals' personnel and the Applico Principals regarding Canals' product roadmaps, business strategies, and customer relationships.

83. Canals has taken reasonable measures to keep such information secret, including by storing such information in secure data rooms, using nondisclosure agreements such as the MNDA and applicable provisions of the IRA, and communicating such information under the explicit expectation that such information be kept confidential.

84. Canals' trade secret information is invaluable to Canals' core functions and operations, and Canals' trade secret information derives independent economic value from not

being generally known to, or readily ascertainable by proper means by, another person or entity that could obtain economic value from its disclosure or use. Canals' trade secrets are the by-product of countless hours and significant expense on Canals' part, and the trade secrets afford Canals an advantage over its competitors.

85. The information accessed by Defendants was only made available to Defendants due to the investment and business-development relationship between them and under the condition that Defendants would preserve the secrecy of Canals' information, as described above.

86. Canals would not have granted Defendants access to its trade secrets had Canals known they were using Canals' trade secrets and confidential information to develop a competing product.

87. Defendants each misappropriated Canals' trade secrets as alleged above, including by acquiring them under improper means. On information and belief, Defendants also misappropriated Canals' trade secrets as alleged above, by using and disclosing Canals' trade secrets to develop and market a competing product and to solicit Canals' existing and prospective customers.

88. On information and belief, each of the Applico Principals disclosed Canals' trade secrets to Augment in connection with the sale of Merlin and their joining Augment, and they continue to use Canals' trade secrets at Augment to develop competing products and to solicit Canals' existing and prospective customers, including by using Canals' customer data, pricing information, sales methodology, and product information to market Augment's competing products against Canals.

89. Defendants were and remain under the obligation not to take, use, or disclose Canals' trade secrets.

90. Canals did not consent to how Defendants accessed, used, or disclosed its trade secrets, as alleged above.

91. Defendants' conduct violates the Florida Uniform Trade Secrets Act.

92. As the direct and proximate cause of Defendants' conduct, Canals has suffered and, if Defendants' conduct is not stopped, will continue to suffer competitive harm, irreparable injury, and significant monetary damages, in an amount to be proven at trial.

93. If Defendants are not enjoined, they will continue to use Canals' trade secrets for their own unlawful benefit and to Canals' detriment.

94. Because Canals' remedy at law is inadequate, Canals seeks, in addition to monetary damages, injunctive relief to account for, recover, and protect its confidential trade secret information from further misuse and to protect its related legitimate business interests.

95. Defendants' misappropriation of Canals' trade secrets and confidential information was intentional, knowing, willful, malicious, fraudulent, and oppressive. Canals is therefore entitled to an award of exemplary damages. Canals is also entitled to an award of attorneys' fees and costs.

**COUNT III: BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING IN THE STOCK RESTRICTION AGREEMENT**
**(Against Applico Capital B2B I, LP)**

96. Canals repeats and realleges the allegations in Paragraphs 1-64 as if fully set forth herein.

97. The SRA is a valid and enforceable contract between Canals and the Applico Fund.

98. The SRA provides that it is governed by Delaware law, which recognizes that every contract contains an implied covenant of good faith and fair dealing.

99. The SRA contains an implied covenant of good faith and fair dealing.

100. Under the SRA, the vesting of the 26,092 shares of Canals' Series A-1 Preferred Stock held by the Applico Fund was conditioned upon the Applico Fund providing "Business Development Support" to Canals.

101. The SRA's vesting mechanism was designed to incentivize the Applico Fund to help Canals grow its business. The parties reasonably expected that the Applico Fund would provide genuine, good faith business development efforts for Canals' benefit, and the Applico Fund's equity would vest in exchange for those genuine efforts.

102. The requirements that Introductions be "bona fide" and that Facilitations "materially advance" a pending commercial discussion were material terms of the SRA, and they required that the Applico Fund's efforts be genuine and in good faith, rather than using the Business Development Support as a pretext to gather competitive information or to build relationships with Canals' existing and prospective customers for a competing venture.

103. The Applico Fund intentionally deprived Canals of the benefit of the SRA's vesting provision and breached the covenant of good faith and fair dealing by using the Business Development Support not to genuinely advance Canals' business, but as a cover to obtain access to Canals' confidential information and to cultivate relationships with Canals' existing and prospective customers for the Applico Principals' own competing venture, as described above.

104. The Applico Fund has deprived Canals of the benefit of the bargain Canals reasonably expected. Indeed, on information and belief, not a single purported Introduction or Facilitation by the Applico Fund resulted in any actual business for Canals. To the contrary,

Canals actually lost existing and prospective customers due to the Applico Fund's purported provision of Business Development Support.

105. As a direct and proximate result of the Applico Fund's conduct, Canals has suffered substantial damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Canals respectfully requests that this Court enter judgment in Canals' favor and against Defendants, jointly and severally as permitted by law, as follows:

A. Awarding actual damages, compensatory damages, consequential damages, exemplary damages, disgorgement of unjustly obtained benefits, lost profits, and interest, in an amount to be determined at trial;

B. Entering an injunction ordering Defendants (and any affiliates, agents, employees, or others under Defendants' control) to (1) return to Canals all of its property, documents, trade secrets, and confidential information; (2) refrain from using or disclosing any of Canals' trade secrets or confidential information except as expressly permitted by the parties' contracts and by law; and (3) refrain from otherwise benefitting from Defendants' misappropriation of Canals' trade secrets.

C. Awarding attorneys' fees, costs, and disbursements incurred as a result of this action; and

D. Granting such other and further relief as the court deems just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Canals hereby demands a trial by jury on all issues that are so triable.

Dated: August 26, 2026

Respectfully submitted,

*/s/ Amanda Greenfield*
Amanda Greenfield
(Florida Bar No. 1054656)
Justin Sher*
Emily McDaniels*
SHER TREMONTE LLP
90 Broad Street, 23rd Floor
New York, New York 10004
Tel.: (212) 202-2600
Fax: (212) 202-4156
agreenfield@shertremonte.com
jsher@shertremonte.com
emcdaniels@shertremonte.com

*Attorneys for Canals, Inc.*

**pro hac vice* applications forthcoming